280 So.2d 786

**Jerry MARCUS**

**v.**

**STATE.**

**5 Div. 172.**

Court of Criminal Appeals of Alabama.

April 17, 1973.

Rehearing Denied May 29, 1973.

Russell, Raymon & Russell, and Allan Nathanson, Tuskegee, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was tried for the crime of assault with intent to ravish. The jury found him guilty of assault and battery and assessed a $500.00 fine as punishment. The trial court added six months in the county jail as additional punishment.

The victim was a coed student at Tuskegee Institute residing on the campus. Around 7:00 P.M. on the night of March 14, 1972, the victim was walking toward the dormitory where she lived when appellant drove up in his car and asked her if she wanted a ride and she told him no. Appellant then pulled a pistol and pointed it at her and told her to get in the car. In obedience to this command, she walked in front of the car to the passenger side and got in the car. According to her testimony appellant pointed the gun at her head and told her to lie down. He gave her two shots in her arm with a needle, which made her awfully dizzy. He tied her hands behind her back with a necktie, blindfolded her with a handkerchief and gagged her. According to her the gag was loose and she freed her hands from the necktie without any difficulty. Appellant drove from Tuskegee Institute to a public lake near the City of Tuskegee, which is adjacent to the Macon County Hospital. They had a conversation in the car and appellant asked her if she could get out of the car. She got out without any help but felt weak and dizzy from the shots and she put her hands on the car to keep from falling. Appellant got out of the car and went to where she was standing and started fondling her. In her own words: "First he was holding me around my waist and then my back and then my behind and my breast." She testified further that he put his hands on her personal parts. She told him he could not rape her as she was having her period.

She further testified that appellant never did say anything to her about sexual relations, he did not remove any of her clothing and did not ask her to remove any of her clothing. At no time during the automobile ride was sex mentioned, and at no time during the entire night did appellant even attempt to have sexual relations with

her. She did not scream for help or make any kind of outcry, stating she did not think anyone could hear her. At the lake, she heard some noises and appellant told her the noises were from the intercom system at the hospital.

Appellant carried the victim back to her dormitory going through the City of Tuskegee to the Institute. When the victim got out of the car, she tried to get the car tag number but only got the last three digits, viz., 816, and the first two digits were either "H–G or 4–6 or something." Upon entering the dormitory with help she made an immediate complaint to her dorm counselor, Mary Catherine Brown, and she was carried to the emergency room at John Andrews Memorial Hospital at Tuskegee Institute. The hospital records were identified by the custodian and, over objection of appellant, introduced in evidence. According to these records, "the admitting diagnosis is (was) drug intoxication." Following emergency treatment, she was admitted to the hospital where she remained three days.

During her hospital confinement she was seen and observed by Dr. Thomas D. Calhoun. He was asked to refer to the medical records of the victim and state the history leading up to her admission and he read from the admitting nurse's note, "The history that was given states that two men took her in a car at gun point and gave her two injections." He was asked to state the victim's emotional condition at the time he saw her, and he said, "She was upset, she was sedated prior when she came into the hospital because she was upset, and, well, she was just upset." He further testified on cross-examination that he did not do a physical examination of her body and he "didn't see any cuts or abrasions or contusions, anything like that."

The investigating officers interviewed the victim at the hospital and got from her the numbers she could remember that were on the automobile tag and traced the number to a residence occupied by appellant.

They put out an "APB" (an all point bulletin) on the car. Several police units joined in the search and appellant was found in the car on Church Street. He was stopped and taken into custody. The officers did not conduct a search of the automobile but with the aid of a flashlight flashing through the glass of the car, they observed the interior and in "plain view" saw a necktie, a tassel, and a small black bag sticking out from under the edge of the driver's side of the vehicle. In the bag was a .22 caliber pistol and some bottles containing liquid, a pair of eye glasses, a picture, a yellow cap described as the kind the officer had observed in the emergency room at the hospital which was used to cover the point of a hypo needle. They also observed the name "Jerry" on the dash of the car. These articles were properly identified and admitted in evidence over appellant's objections.

The police officers testified that they received a complaint from the victim around 10:00 P.M. and they arrested appellant sometime after 12:00 midnight and carried him to the jail in Tuskegee. They said they gave appellant "his rights" and started questioning him around 12:50 A.M.

From the record:

"Q. And what were those rights that you advised him of?

"A. I advised him that he had a right to remain silent, that he didn't have to make any statement, that any statement that he made could be held against him in a court of law, that he had the right to have an attorney present when making the statement."

Appellant wrote out a statement in his own handwriting and signed it in the presence of a police sergeant of the City of Tuskegee and a security officer at Tuskegee Institute. The statement was completed and signed at 5:10 A.M. The officers admitted that it took a long time for appellant to write out the statement. They said that during the time he was preparing the

statement, appellant told the officers that he wanted to stop and rest and get something to eat, and they told him to finish writing the statement first. The statement is as follows:

"S. Ex. 3
11/7/72 (4 pps)
DMM

Date 14 March 72

"STATEMENT OF: JERRY MARCUS

"The first time I saw Miss Jenifer, I was coming up the old Mont. road. I had reached the second red light before you reach Federal Credit union. I saw her through my rear view mirror. The light held long enough for me to get a good look at her. When the light changed, I turned at Lincoln Gates and turned left on the street of the Emory's on campus. I circled around the engineering building & I saw her walking. I asked her was she going toward Resident D. She said yes. So I by passed D. She said that she was going to Resident D. I told her to get down on the floor with my revolver. I went to town around the V.A. road. I turned left going toward Rockerfellow. When I got to the Old Folds home I turned right. We took Cedar street to the end of the road, then started back toward town. She didn't say anything. I also took her around the lake. She asked was I going to rape or kill her. I told her no. She said that her period was on. I said don't worry about it. So I asked her to sip up (sic) & turn her back toward me. I used the same tie to tie her up. Then I put my handkerchief over her eyes, nose & mouth. Then I asked her to lay down. I injected two shots in her. It was penathol. (sic) She said that she never been that high before. Then she said why don't you untie me, I can run anywhere, I can't do nothing. So I said just relax. Then I said do you feel like you can stand up. She replied I don't know. Then I opened the door for her.·

She got out, & so did I. She leaned against me. We heard a voice on an intercome (sic). She replied what's that. I said that was at the Hospital. Then I asked her were she cold. She said not yet. I look up toward the sky. I asked her did she see the stars, she said yes. Then I helped her back into the car. I asked her what was her boy friends name. She told me his name, I also forgot it. She replied, did he tell you to do this. I said no. Then she replied your're nice. She mentioned what time was it. It was after eight. She said that she had to study. So we came back to campus the same way. Only throug (sic) town on Highway 80. When we reached Resident D. I told her that I would turn around first before I let her out. (sic) So I turned around and asked her for he (sic) phone number again. She said 4915 I think. So she admitted that she was glad it happened. Then I come back from off campus & stopped at the phone booth next to Coley's Grocery. I called Miss Gwendolyn Synecal. I told her I had been to Shorter. That was my excuse for not calling her earlier. So she asked me was I coming over, so I said wait until tomorrow. She asked again. So I said I'll be over shortly. I arrived there at about 9: p.m. (sic) We laughed & talked & watched T.V. until 12:00 then I left there on my way home. Just as I turned off on South Church Street. I was stopped; by an Police Officer (sic). Mr. Mitchell stopped me. Then the rest of the crew came. Miss Jenifer Barrington; I knew the first time that everything worked so well with Miss Shotgun (the girl I mett on the rainey nigh) that in my mind, I got heavy headaches (sic). I was always told my love ones, friends, ect. (sic) that you should follow your mind but in my mind I knew that this was wrong. I treated Miss Jenifer very nice after we parked. I also told her that I wouldn't rape or kill her. She asked me to untie her so she could talk to me. So I waited about five minutes

more,* finally released her. After sitting down by the lake for a while, I brought her back to her Dorm. She asked me, how did I learn her name so quickly when I mentioned it to her. She also asked me did someone ask me to do this to her. It might have been her boyfriend, but I can't recvall (sic) asking who he was. I admitted I was sorry for what happen (sic). She said that she was glad it happen (sic). She can testify that. (sic) I stole the drugs from the anethesia room of John Andrew Hospital. Feb. 29/1972.

"Jerry Marcus /s/
"Witness Det. Sgt. Mitchell /s/
J. Walker /s/        5:10 A M"

At the conclusion of the state's case, appellant made a motion to exclude the state's evidence on the ground that the state had utterly failed to make out a prima facie case of assault with intent to ravish, which motion was overruled.

Appellant offered no evidence in his own behalf but put on five witnesses who testified that his character and reputation were good.

Appellant urges a reversal because of the admission in evidence of the written confession without laying the proper predicate, insufficiency of the *Miranda* warnings, and the action of the trial court in allowing hearsay evidence, all over his objections.

The statement made by appellant is incriminating in a meaningful way though it is exculpatory so far as the charge made against him of assault with intent to ravish. The statement incriminates him to the extent that he admits kidnapping the victim at gun point, binding her hands behind her back, blindfolding and gagging her, giving her two injections of penathol (sic) (truth serum) in her arm, and carrying her on a ride where he took certain liberties with her person. This unpermitted touching of her body constituted an assault and battery, for which he was convicted, resulting in a $500.00 fine and a jail sentence of six months. Had he been indicted for kidnapping, his confession would have aided in proving the corpus delicti, assuming that all of the safeguards surrounding the admissibility of confessions were met and survived the tests, whereupon he could have been sentenced to the penitentiary for a good many years.

■    There was no error in the admission of the hospital records in evidence. These records were properly identified by the medical records custodian. Spain v. State, 37 Ala.App. 311, 68 So.2d 53; Aaron v. State, 271 Ala. 70, 122 So.2d 360; Liberty National Life Insurance Company v. Reid, 276 Ala. 25, 158 So.2d 667; Title 7, Section 415, Code of Alabama 1940.

A serious question is presented on this appeal as to the voluntary character of appellant's confession and as to the sufficiency of the *Miranda* warnings preceding the interrogation culminating in the confession. The trial judge heard the evidence bearing on the admissibility of the confession without the jury present. It is to be noted that at no time during the *voir dire* did the prosecution prove, or attempt to prove, that no threats were made against the accused, no promises of reward, or hope of reward, or other inducements were held out to appellant to get him to make a statement. After a *part* of the confession was read to the judge he ruled that the same was admissible:

"MR. AARON: Do you want the rest of it?

"THE COURT: The Court feels that this has been voluntarily made and it is a confession in the man's writing and his rights were told to him as required by law and if you want to admit it—bring the Jury back. Got to go through the whole thing again in front of the Jury.

"MR. AARON: Just a minute.

"THE COURT: Wait a minute.

"MR. AARON: How much more is there to this statement? I would like to hear the complete statement.

"THE COURT: All right. Keep them out. Go ahead and finish the statement."

At the conclusion of the reading of the alleged confession, the court said, "All right. Bring the Jury back." At this point appellant's counsel requested that he be permitted to ask certain questions which the court allowed.

It was developed during this cross-examination that the officers arrested appellant shortly after midnight, and after he was questioned in the presence of three officers for thirty-five to forty minutes to an hour, he agreed to write out a statement as to what occurred. These officers further testified that after appellant had been writing for a period of time (they would not say how long), he told them he wanted to stop and rest and have something to eat. The officers freely admitted they told appellant that when he finished the statement he would be able to rest and have food.

From the record:

"Q. Wasn't it after he told you he wanted to go to sleep and you all told him he couldn't go to sleep until he wrote it and signed it?

"A. He advised that, I just don't know what time it was. He advised that he wanted something to eat and wanted to get some rest. He didn't say anything about sleeping. We advised him as soon as he finished the statement that he was in the process of writing the statement at that time.

＊　　＊　　＊　　＊　　＊　　＊

"Q. And he told you he wanted to rest?

"A. Yes.

"Q. And get something to eat?

"A. Yes.

"Q. And you told him he couldn't do that until he finished writing, is that what you said?

"A. He was in the process of writing.

"Q. I understand that but he told you—

"A. —he was writing and I told him to finish writing, he was almost through.

"Q. I didn't ask you that. You advised him he couldn't stop writing until, he couldn't rest until he stopped writing the statement?

"A. I advised him to finish the statement, yes.

"MR. RAYMON: That's all."
Further,

"Q. Now, he started writing the statement you say, is that correct?

"A. Yes sir.

"Q. Now, while he was writing the statement didn't he tell you he wanted to stop and rest and get something to eat?

"A. Yes sir, he did.

"Q. Didn't you tell him he would have to finish writing the statement first?

"A. I asked him to finish writing the statement first."

At the conclusion of the cross-examination, the following occurred:

"BY MR. AARON:

"Q. Is that his handwriting, Sargeant? (sic)

"A. Yes, it is.

"MR. AARON: No further questions.

"MR. RAYMON: We object to that being introduced as a voluntary statement, a voluntary confession under the laws of the State of Alabama and the United States Constitution.

"THE COURT: Overruled. The Court thinks that the statement has been voluntarily made and that adequate warning had been given. Let the Jury come in."

After the jury returned to the box, the confession was read to them. Prior to reading the confession, the state laid the

proper predicate as to threats, promises and other inducements.

The *Miranda* warnings as hereinabove set forth in this opinion appear twice in the record, both times in almost identical language. As to the right to consult an attorney, the officer said, "I advised him that he had a right to an attorney to be present while making a statement." Neither was the accused told that if he chose to answer questions and then decided later that he did not wish to be questioned further that his wishes to remain silent would be respected and the interrogation would cease. This was not in full compliance with Miranda v. State of Arizona, 384 U. S. 436, 473, 474, 86 S.Ct. 1602, 1627, 1628, 16 L.Ed.2d 694, wherein the Court said:

"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. *Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one.* The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any state-

ment taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." (Emphasis added)

The statement made by the Supreme Court of the United States in Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70, is applicable here:

"Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

■ The interrogating officer asked appellant if he understood these rights and he replied that he understood his rights. Under *Miranda* this could not be true because he was not fully apprised of his rights. There can not be an intelligent waiver of rights in the absence of a full and complete disclosure of all rights.

Appellant's confession states that after he returned to the victim's dormitory and released her, he went to his girl friend's house and watched TV until twelve o'clock and upon leaving her house he was stopped by the police as he entered Church Street. He was in the presence of three officers from the time he was carried to the jail in Tuskegee until he wrote and signed the confession which was at 5:10 A.M. He

was without sleep, food or rest all night. His request for food and rest was denied him. He had no communications to the outside. He was not advised of his rights to appointed counsel nor was he told that his right to remain silent would be respected if he decided that he did not want to answer any more questions.

This is not a case of long and protracted examination of an accused by many officers acting in relays, under bright lights, for days and nights without sleep, food, water and other comforts; held incommunicado; denied the use of the telephone to communicate with family and friends, and subjected to physical abuse and threats. The question here is whether the confession was the product of coercion, physical or psychological, to the extent that it was involuntary. In Rogers v. Richmond, 365 U.S. 534, 540, 81 S.Ct. 735, 739, 5 L.Ed.2d 760, the Supreme Court said:

> "Our decisions under that Amendment (Fourteenth) have made clear that convictions following the admission into evidence of confessions which are involuntary, i. e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system —a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. * * *"

The facts surrounding the making of the confession in this case, standing alone, do not render it per se involuntary because of physical and psychological factors, but when coupled with inadequate *Miranda* warnings in one of the most important areas of constitutional due process— the right to appointed counsel, we hold the confession to be involuntary and reverse the conviction. Square v. State, 283 Ala. 548, 219 So.2d 377. We would point out that there was sufficient independent evidence upon which the jury could have rendered the same verdict.

Reversed and remanded.

All the Judges concur.