305 So.2d 396

**David Edward CROWE**

v.

**STATE.**

**5 Div. 246.**

Court of Criminal Appeals of Alabama.

Dec. 17, 1974.

William J. Baxley, Atty. Gen. and Carol Jean Smith, Asst. Atty. Gen., for the State.

Whitesell, Gordon & Gallion, Montgomery, for appellant.

TYSON, Judge.

The two-count indictment charged the appellant with second degree burglary and grand larceny of the Elizabeth Shop owned by one Elizabeth Broxton in Millbrook, Alabama. The Jury's verdict found the appellant "guilty as charged in the indictment" and the trial court then adjudged the appellant guilty and set sentence at five years imprisonment in the penitentiary.

James P. McAdams testified that he was a deputy sheriff of Elmore County, and on the early morning of June 25, 1971, he was in the Millbrook community on patrol. He stated that he went to the Elizabeth Broxton Shop, which was a ladies' apparel dress shop in the Millbrook shopping center, arriving there between 1:30 and 2:00 in the morning. He stated that when he went to the rear of this shop a security guard came up and stated, "I believe there is someone in the building." The two men went to the rear door and looked in. They observed a male through a crack in the door. Deputy Sheriff McAdams stated that there was a light on inside the store, that suddenly

there was a lot of commotion and glass breaking at the front of the store, and that by the time he ran around to the front of the store he saw a subject running through a service station and leave. He could not make a positive identification of the person he saw inside the store. He stated that he then went into the shop with the guard, that they found that a hole, two and one-half feet wide, had been knocked into the sheetrock, and that boxes had been pulled out from under the counters and thrown around, that the cash register was open. He stated that the front door had been kicked out and broken glass was scattered all around.

Deputy Sheriff McAdams further testified that within fifteen to twenty minutes after making his investigation of the store, an automobile came up from the vicinity of the rear of the stores, and that the vehicle was stopped. In it was sixteen year old James Crowe, the brother of the appellant. He stated that he took James Crowe into custody at that time.

Mrs. Wilma Edith Smith testified that she was the manager of the Elizabeth Broxton Dress Shop in Millbrook, Alabama. She testified that she closed this store on the evening of June 24, 1971, about 6:00. She stated that when she arrived to open the store the next morning, between 8:30 and 8:45, the front door was broken open and that there was glass scattered about, that there was some missing merchandise and boxes scattered on the interior. She further examined a money bag with the initials E. B. in the corner and stated that this money bag was the property of Mrs. Elizabeth Broxton who owned the store, that she had placed these initials in the corner of the money bag. She stated that this was missing the next morning from the store.

Chief Deputy Sheriff Sidney Thrash testified that he made an investigation on the early morning of June 25, 1971, at the Elizabeth Broxton Dress Shop in Millbrook, Alabama, and found the front glass

door broken out and that glass was on the sidewalk. He stated that he talked with James Crowe, the brother of the appellant, and began looking for the appellant, David Crowe. He testified that he arrested the appellant the following morning at his mother's home. Prior to questioning the appellant, he stated that he advised the appellant he was under arrest and then gave him a full Miranda warning. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694, 10 A.L.R.3rd 974. The appellant then gave him the following statement orally at his home, and following this he took Chief Deputy Sheriff Thrash where he had thrown out the money bag in a field where he retrieved same:

"Q Well, state the conversation had between the two of you.

"A Well, I—after I informed him of his rights, I informed him that I had his brother—younger brother under arrest, and his younger brother said he had dropped him off. That they had been in Montgomery, and that David had been drinking, and that he wanted—he wanted some more money. He run out of money, and his brother said he got him to run him back out there, and he dropped him off, and he told him to circle around and pick him up in a few minutes at this —in front of the Shopping Center. So, to the best of my recollection, about that time all of these other folks came into the bedroom. Now, his wife wasn't in the bedroom at the time I started talking to him. Of course, they showed me where he was at, and said, 'David, there's somebody here to see you,' and that's when I walked back there and talked to him, and I placed him—told him to consider *hisself* under arrest, and since— said, 'we've got to go back to the Shopping Center and finish the investigation.' So after I told him about his brother being under arrest over here, and what his brother had told me, then, he said, 'well, I might as well tell you about it, then.' So as we were leaving—the Policemen had went out there with me

from Prattville, and myself, and he—that's when he related the—this conversation—the end of this conversation was related then, 'that I'll take you where I threw this money satchel out. It's on the way back to the—to the Shopping Center,' and as we talked—and I said, 'well, where did you go?' And he said, 'I went to Montgomery after I got the money out of the Shop'—says, 'that's the reason we went and got this money.' Says 'that's the reason I broke in the place.' Says, ''cause I was in Montgomery a drinking around, and needed something to buy beer with, so I decided I'd go out there and get something.' And so on the way back from Prattville to the—to the Shopping Center, he turned me off in a field—that same field the bloodhounds were put off in, and we walked out there and looked around a little bit, and picked up this bank sack (Indicating).

"Q Now, just what did he—

"A And he said, 'here's the bank sack' (Indicating).

"Q Now, look at—I'll ask you to look at State Exhibit Number One, and ask you if that is the bank sack that he showed you? (Indicating)

"A Yes, sir, that's the same bank sack (Indicating).

"Q And where has it been since you picked it up? (Indicating)

"A It's been locked up in my office over there (Indicating).

"Q And is it in the same—the same condition now as it was at the time you picked it up there in the field?

"A Yes, sir."

Sheriff Thrash further testified that there was no money in the money bag at the time it was found in the field, that the appellant stated that he had kicked out the front door of the shop with some cowboy boots which he wore on the evening in

question, and that he had gone honky-tonking that night and spent the money he obtained from the shop.

The appellant did not testify at trial, but offered the testimony of his sister-in-law, Jimmie Sue Carr Crowe, who testified that she was at the appellant's mother's home when Sheriff Thrash came to arrest the appellant, that there were a lot of children in and around the house, and that the Sheriff said, "We have James and we came after you." She further testified that she did not hear the appellant being informed of his rights by Sheriff Thrash.

I

The appellant insists that there was here an inadequate and insufficient *Miranda* warning at the time he was subjected to an in-custody interrogation at his mother's home following his arrest by Sheriff Thrash.

Sheriff Thrash testified as follows:

"Q Did you have a conversation with him at that time?

"A I did. Yes, sir, inside the house there with his—in his bedroom, I believe. He was sitting on the side of the bed when I was talking to him.

"Q Anybody else there immediately?

"A There were several other people milling around. I—at the time the conversation started there was nobody but just David and myself in the room.

"Q All right. Now, did you warn him, or advise him rather, of his rights?

"A I did after I told him he was under arrest.

"Q All right. Did you advise him that he had the right to remain silent?

"A I did.

"Q Did you advise him that anything that he might say would—could, and would, be used against him in a court of law?

"A  I did.

"Q  Did you advise him that he had a right to talk to a lawyer, and have him present while you were being—while he was being questioned?

"A  I advised him that he had a right to talk to a lawyer before he was questioned.  I don't think I worded it just like you did there just then.

"Q  Well, did you tell him—advise him that if he couldn't afford to hire a lawyer, that one would be appointed to represent him before you questioned him?

"A  I did.  Yes, sir.

"Q  If he wanted one?

"A  Yes, sir.

"Q  And, then, after that did you ask him if he understood—did he understand what you'd explained to him, as far as his rights were concerned?

"A  I don't believe I asked him that. No, sir.

"Q  Well, did you ask him then did he —after you had advised him of these rights, did he want to tell you anything?

"A  I didn't say it in those words, but after I advised him of his rights there, *he informed me that he knew his rights.* So, then I started telling him what I had, and he_____" [Emphasis added]

.      .      .      .      .      .

"Q  Now, at that time, and before—I believe you said only the two of you were there in the room at his home— there at his bedroom at his home?

"A  Yes, sir.

"Q  And just the two of you were there when he_____

"A  At his mother's home.  Now, I don't know if it was his home, but he was_____

"Q  But in a bedroom there?

"A  Yes, sir.

"Q  Just the two of you being present —present?

"A  Yes, sir.

"Q  And it was the next morning after this took place?

"A  Yes, sir.

"Q  And that there, and at that time, and at that place, and under those circumstances, did you, or anyone in your hearing, or presence, offer any reward, hold out any inducement, or make any threats, in order to get him to make a statement?

"A  No, sir.

"Q  Did he make a statement?

"A  Yes, sir."

The cross-examination of Sheriff Thrash is as follows:

"Q  Sheriff Thrash, you've stated to this Court that you advised David Crowe of his rights?

"A  Yes, sir.

"Q  Did he sign any type of paper?

"A  No, sir.

"Q  Did you read his rights from a card?

"A  No, sir.  I recited 'em to him.

"Q  Well, what was that you said a while ago that you didn't inform him— inform him of what, or—did you ask him about his_____

"A  I informed him of his rights, but I didn't—I didn't read off like you read off wherein—his Miranda rights there, 'that you have a right now to stop answering questions any time you see fit.' That's not following the Miranda warning.  Just the four or five things you're supposed to inform them of is the—is my impression of the Miranda warning.

"Q  Uhuh.

"A  It's been discussed in the Police Academies throughout the United States that those four things are the things to inform them of.

"Q  Well, did you ask him whether or not he understood his rights?

"A  I didn't ask him. *He told me he knew his rights.*

"He told you that he knew his rights?

"A  *He made the volunteer statement that he knew his rights.*

"Q  Okay."  [Emphasis supplied]

The appellant contends that the foregoing is an inadequate Miranda v. Arizona predicate because:

1.  The *Miranda* predicate was not full and complete, and;

2.  Sheriff Thrash was interrupted in the process of giving this warning, thus, a complete predicate was not laid in the trial court before the admission of the appellant's statement.  The appellant cites to us our opinion in Marcus v. State, 50 Ala. App. 526, 280 So.2d 786, cert. denied 291 Ala. 350, 280 So.2d 793.  The trial court here properly excused the jury during the laying of this predicate under Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L. Ed.2d 908; and Duncan v. State, 278 Ala. 145, 176 So.2d 840; also Smith v. State, 282 Ala. 268, 210 So.2d 826.

The appellant took the stand to challenge this predicate, and in his testimony testified pertaining to Sheriff Thrash's explanation of his rights under *Miranda*: "Well, in a way he did, and in a way he didn't," and that he was told that he was under arrest in the words, "Come and go with me."  He stated that he did not tell the Sheriff that he "knew his rights."

However, on cross-examination the appellant testified that he had "once been given his rights," but that it "was not" by Sheriff Thrash, and that "he guessed" that Sheriff Thrash only gave him one or two rights because it was "noisy" and because "his younguns were crying."

The trial court heard the testimony of the witnesses and determined from this "that he understood his rights," and overruled appellant's motion to suppress the confession.

■  Where, as here, the voir dire examination is in the record, the presumption of correctness which attends the trial judge's ruling will not be overindulged.  Duck v. State, 38 Ala.App. 652, 92 So.2d 55.

■  With reference the appellant's contention that the cross-examination of Deputy Sheriff Thrash showed that he did not tell the appellant that he had the right to stop answering questions, this court in Green v. State, 45 Ala.App. 549, 233 So. 2d 243, made the following observation:

"The *Miranda* opinion itself does not place explanation of this subsequent right to cease answering questions as being an integral part of the required initial warnings requisite to a valid waiver. We note that in the opinion, the following two excerpts are couched in terms of when interrogation, once begun, must stop:

" '*  *  *  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.  The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the *right to refrain from* answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*    *    *    *    *    *

" 'Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. * * *.'  [Italics added;  footnote omitted]"

Thus, we find that while such advice is helpful to the State's case, we find no error in this aspect of the *Miranda* warning in the instant case. Watts v. State, 48 Ala.App. 143, 262 So.2d 630.

 As distinguished from Marcus v. State, 50 Ala.App. 526, 280 So.2d 786, cert. denied 291 Ala. 350, 280 So.2d 793, we find in this record a full pre-*Miranda* predicate. Moreover, while the appellant, himself, equivocates on the issue of the fullness of his *Miranda* warning, the Deputy Sheriff's testimony and the finding of the trial court determines that the appellant fully understood this warning before he gave his statement.

As shown in the record, he was at the home of his mother, in the bedroom, and talking alone with the Deputy Sheriff. There is no contention that he was here denied either food or rest. This is not a case of a long or protracted examination of an accused being held incommunicado and subjected to threats or abuse. The record discloses to the contrary. The trial court so understood and determined, and this is borne out by the record itself.

Nor do we find that the *Miranda* warning, with reference to the accused's right to consult with counsel, was futuristic, as was the case in Square v. State, 283 Ala. 548, 219 So.2d 377. The record here shows that the appellant was advised that he had a right to talk with an attorney *before* he was questioned, and that one would be appointed to represent him *before* he was questioned if he could not afford counsel.

While the warning given by Deputy Sheriff Thrash is not an example of clarity, we are of the opinion that this warning was sufficient to advise the appellant that an attorney would be appointed for him prior to questioning if he could not afford one. We therefore find that the appellant's statement allegedly given to Deputy Sheriff Thrash was admitted without error. Moore v. State, 291 Ala. 522, 283 So.2d 187.

We have carefully examined this record, including the trial court's oral charge, and its other rulings in this cause, and find this record to be free from error. The judgment is therefore due to be and the same is hereby

Affirmed.

All the Judges concur.