TYSON, Judge.
Presley James Bailey, alias, was indicted for the robbery of John 0. Snowden by taking $2,980.00 in currency from his person, or by putting him in fear, etc. The jury found the appellant “guilty of robbery, as charged in the indictment,” and fixed punishment at imprisonment for twenty-five years and one day.
John 0. Snowden stated that he resided at The Club Apartments, 937-F Valley Avenue, in Jefferson County on June 16,1977. His wife, Freada Wallace Snowden, and their two month old baby girl were at their apartment with him about 2:00 o’clock that afternoon when a knock was heard on the front door. As he was on the telephone, his wife went to the door. A black male, wearing a U.P.S. uniform, carrying a package with Snowden’s name on it and a clipboard, stated that he needed to have Snowden sign for the package as his name was on it. His wife called to him, and, as he walked into the living room area, the black male, whom he positively identified in court as the appellant, Presley James Bailey, pushed him to the floor and kicked him on the head. He pushed his wife and used profanity while holding both of them at pistol point. Snowden stated that the appellant had a .38 caliber revolver and that he handed his wife some tape and directed her to tape Snow-den’s hands behind his back and to also place tape over his mouth and around his feet. While Snowden was lying on the floor, the appellant put the .38 caliber pistol near his head and pulled the trigger. Snowden related that his head went back, that he was deafened and dizzy. He stated that he was lying face down and the bullet, fortunately, passed his eye and went into the the floor. Snowden related that later he had to have surgery on his ear, that he was deafened for some time.
Snowden related that he was the owner of Freada’s Domino Lounge in Homewood, Alabama, and had just returned from a trip. He stated that he had a great deal of cash in the apartment as he was paying bills, including a number of bills for whiskey, which were paid in cash.
Snowden stated that the appellant taped his wife’s hands behind her, then went to the desk where he had been working and picked up $2,980.00 in United States currency. He stated the appellant then went to the bedroom and got a pillowcase in which he placed valuable jewelry and antiques, then left the apartment. The appellant left the clipboard and package with Snowden’s name on it on an aquarium inside the front door, and, in his haste, left the pistol on the bed in his bedroom. This pistol was identified as State’s Exhibit One. Snowden related that, after the appellant left the apartment, his wife worked her hands loose and locked the front door. She then telephoned the Homewood police.
Snowden related that Homewood Police Officer Carr was one of the several officers who answered the call, and he turned over the pistol, clipboard and package to him. Snowden then identified a cigar box, which was inside the brown paper, as State’s Exhibit Three; the brown paper as Exhibit Four; a partial roll of tape as Exhibit Five; some used tape, which contained a bit of Snowden’s hair and gunpowder residue, as Exhibit Six; and the clipboard as Exhibit Seven.
Snowden stated that the appellant also left a 357 magnum, which belonged to him, lying near the .38 caliber pistol which appellant had brought with him and used in the robbery, on the bed in the bedroom.
On cross-examination, the appellant was described as wearing a khaki U.P.S. uniform and a brown cap. The appellant wore black shoes and had a goatee.
Snowden stated the robbery occurred on a Thursday afternoon about 2:15 or 2:30, and that the police came in response to his wife’s call within a few minutes after the robbery.
*1280 Snowden placed a value of $60,000 to $70,000 on the jewelry and antiques carried away in the pillowcase by the appellant.
Freada Wallace Snowden stated that she was'the wife of John O. Snowden and lived on June 16, 1977, at 937-F Valley Avenue, Homewood, Alabama. She stated that she and her husband had just returned home from a trip two days earlier. She stated that shortly after 2:00 in the afternoon the doorbell rang, and a uniformed black male, carrying a U.P.S. package for Mr. John O. Snowden and a clipboard, was at the door. She stated that the black male was the appellant. She said the black male asked that her husband sign for the package. As she admitted him into the apartment, her husband walked into the room, and the appellant pointed a pistol at him and told him, “This is a stickup.” She said the appellant stuck the pistol in her stomach, and the husband stated, “Don’t hurt my wife or baby.” The appellant then struck her husband with a gun, pushed him to the floor, and kicked him on the head. The appellant then directed her to tape her husband’s hands behind his back and to tape his mouth and feet. She stated that the appellant then taped her hands and mouth, and she saw him go into the bedroom and get a pillowcase.
Mrs. Snowden indicated that her husband was in the process of paying some bills and they had a good deal of cash on hand on the dining room table. She stated that the appellant brought jewelry and antiques into this area and filled the pillowcase, then went out the front door.
Mrs. Snowden stated that at the time she had managed to get loose from the tape she immediately locked the front door. She then removed the tape from her husband’s hands and feet and telephoned the police, who came over in a short time.
Mrs. Snowden indicated that several officers came, but that Homewood Officer Carr was handed the pistol used by the appellant and left in the bedroom, the package, brown paper, clipboard and tape.
On cross-examination, Mrs. Snowden testified she was a diabetic and had been for eleven years. She stated this incident had caused her to take additional medications due to pain in her hands and feet from the diabetic condition.
Mrs. Snowden stated that she was later shown some photographs and attended a lineup where she picked out the appellant.
George R. Carr III stated he was evidence technician with the Homewood Police Department and had taken some courses which assisted him with identifying such matters as fingerprints, gunpowder, and tapes. He stated that, on Thursday, June 16, 1977, shortly before 3:00 in the afternoon, he went to the Snowden’s apartment at 937-F Valley Avenue and there received a .38 caliber pistol, State’s Exhibit One, some bullets, which he removed from the RG 10, .38 caliber pistol, four in number, plus one spent hull, and placed in a plastic envelope with his initials on it, and which was State’s Exhibit Two. Officer Carr then identified Exhibit Three, a cigar box; Exhibit Four, some brown paper used for wrapping, with John O. Snowden’s name on it; Exhibit Five, a roll of tape; Exhibit Six, some used tape, which contained a bit of Snowden’s hair and a dark powder residue; and Exhibit Seven, a clipboard. Officer Carr stated that he was able to lift just one fingerprint from all of these items, but that such print did not match that of the appellant.
On cross-examination, Carr was asked about fingerprint comparisons with David D. Church and N. D. Farris. He stated that these were also negative. He stated that the .38 caliber pistol only contained five rounds, and that one of these had been fired.
Homewood Detective Sergeant Edward A. McKenzie stated that he went to the residence of John O. Snowden on Valley Avenue on June 16, 1977. He stated that he began the investigation of a robbery, which took place that afternoon, and, together with Officer W. A. West, arrested the appellant in front of 2920-D S. J. Bennett Drive in Birmingham on March 28, 1978. He stated that he and Sergeant West *1281 gave the appellant a Miranda warning at the time of his initial arrest (R. 93), which was about 2:30 in the afternoon. Sergeant McKenzie stated that he later gave the appellant his Miranda rights again at Homewood Police Headquarters, and he signed a waiver, State’s Exhibit Eight.
After conducting a lineup that afternoon, in which Mrs. Snowden made a positive identification of the appellant, Sergeant McKenzie called the appellant’s mother, Mrs. Ollie Lebon, and, in her presence, gave the appellant his Miranda rights warning a third time, then conducted a taped, interview with the appellant. In this, the appellant fully admitted the robbery of Mr. and Mrs. Snowden on June 16, 1977. He testified that he did this under duress and force of one Roger Lee Cahela. Bailey indicated that he had been picked up by Cahela earlier and taken to the home of David Dickins Church, where he was directed, under threats against himself and his family, to carry out a robbery of the Snowden apartment. The appellant’s full statement is quite lengthy, but after the admission in evidence of the Miranda warning and the establishment of a full “voluntariness predicate,” showing that such was given without any threats, coercion, intimidation, or inducement, Exhibit Nine was admitted into evidence. A pertinent portion of this statement appears on pages 101-104 of the record as follows:
“Question. You are pointing to the photograph of David Dickins Church?
“Answer. Yes.
“Question. I will show you the name on the back of the picture, David Dickins Church. Who all was in the car at the time when he made this threat to you? “Answer. Just me and him.
“Question. Do you recall what day or date it was?
“Answer. I don’t know what day it was but it was in the summer.
“Question. Did you in fact go in and do the robbery?
“Answer. He made me go up to the door and knock on the door. He stood off in the little cut so nobody could see him watching me till I went in and told me the other gun would be filled with blanks so don’t try nothing.
“Question. Can you describe the apartment that he sent you up to and that you went into?
“Answer. It was some apartments in Homewood somewhere.
“Question. Do you recall what road they are off of, street they were off of? “Answer. I don’t remember the road or street, but they were some apartments that were down in a little area and other apartments were up higher.
“Question. What happened when you went to the door?
“Answer. He gave me this box. It didn’t feel like nothing was in it and told me to go to the door and say UPS and when they opened the door to put the gun in their face and tell them to give me all the money and I told him, ‘Man, I don’t know nothing about robbing anybody cause I don’t do no stuff like that,’ and he told me, ‘Well, you’re going.’ So, I went on in cause I didn’t want him to shoot me.
“Question. Who all was in the apartment when you went in?
“Answer. A man and a lady.
“Question. Can you describe them, do you remember anything about them? “Answer. All I can remember was it was a fat lady.
“Question. After you got in what did you do?
“Answer. He told me when I got in, he gave me some tape and said tape them up. I tried to tape them up but the tape wouldn’t stick cause I only have one good hand, my left hand is no good cause I can’t bend these fingers on it. So, I couldn’t tape them too good. He told me to get what I could carry and come back out to the car and lay in the back seat. He said that was the only way I could get from over there so I went back to the car and got in the back seat and drove off.
“Question. Did anything unusual happen after you got in?
*1282 “Answer. Nothing except he told me to lay down on the floorboard and he took me back to Roger’s house. They went to splitting the money and I told them, ‘I don’t want no part of that, I just want to get out of here.’
“Question. I mean did anything unusual happen after you go into the apartment? “Answer. Nothing, but the gun went off while I was trying to tape them up but I sure didn’t hit nobody.
“Question. Can you recall what all you took out of the apartment?
“Answer. Just a bag with some change and a few dollars in it and a couple of jewelry boxes.
“Question. What kind of car were you all in when you went over there, James? “Answer. We were in Roger’s car, he had a green Cutlass, I think. I think it was a Cutlass, I’m not too sure, it’s been a long time.
“Question. When you left the apartment and went back to the car did you— “Answer. He was waiting for me outside the apartment.
“Question. This man you pointed out, David Church?
“Answer. Where they couldn’t see him, he was waiting for me.
“Question. Did you go back to the car and then get out of the car and start back to the door?
“Answer. Yes, he told me to go back and get the gun.
“Question. What happened when you went back?
“Answer. I started back and I got almost there and I saw them moving around in there and I came back to the car and I told them, T ain’t going back in there, those people are loose.’ He said, ‘Get in the back seat and lay down.’ He had the gun laying on the front seat so I got in the back seat and laid down.
“Question. Where did you all go then? “Answer. He took me to the Southside, not too far from the Southtown apartments, not far from McDonald’s.
“Question. Was that before you went back to Roger’s house?
“Answer. That was when we went back to Roger’s house, somewhere by McDonald’s, off Eight Ave. So.
“Question. When you got back to Roger’s house, what did all three of you do?
“Answer. They went to splitting up the money and they said they had the jewelry and they were going to take it somewhere and sell it and they would get in touch with me later. I never did hear anything from them since so I didn’t worry about it.
“Question. Do you remember what you carried the jewelry away in?
“Answer. A pillowcase.”
On cross-examination, Detective Sergeant McKenzie stated he received a map from one Roger Cahela, showing the address where the appellant lived, and that Cahela drove a green Pontiac Grand Prix. He stated that he ran a firearms examination and found that the .38 caliber pistol used by the appellant belonged to one Maureen Pena, and through Mrs. Pena found that the pistol had been given to one Frank King, who in turn gave it to Roger Cahela.
On cross-examination, McKenzie indicated that the fingerprints lifted from the package did not match those of Roger Cahela or David Dickins Church, who was also questioned. McKenzie stated that Church drove a silver-gray 1977 Ford Granada. Further, on cross-examination, McKenzie indicated that Mr. Cahela drove a green over white Pontiac Grand Prix, and that he had not been able to ascertain who owned a green and white Olds Cutlass. He further indicated he was unable to ascertain the identity of a third person, a black male, mentioned in the appellant’s statement.
The appellant did not testify at trial or present any evidence in his behalf. The oral charge of the trial court is extensive, and after an extension thereof, both sides announced, “Satisfied.”
I
Appellant challenges the admission into evidence of the appellant’s statement taken by Homewood Detective Sergeant McKen *1283 zie at the Homewood Police Headquarters on the afternoon of March 28,1978, at 5:25 in the afternoon, in the presence of his mother, Mrs. Ollie Lebon, and Detective Sergeant McKenzie.
In our careful examination of this record, we have determined that the appellant was given a full Miranda warning on his initial arrest and on two other occasions that same afternoon before making his statement, which was taken on tape and reduced to writing, then read back to the appellant in the presence of his mother before he executed same. A full voluntariness predicate was also established, as required by law.
We are of the opinion that the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) was here fully complied with.
As noted by this Court in Williamson v. State, Ala.Cr.App., 370 So.2d 1054, 1062, affirmed, 370 So.2d 1066 (1978).
“There is no contention here that the appellant was denied either food or rest. This is not a case of long or protracted examination of an accused being held incommunicado and subject to threats or abuse. The record in this cause is entirely to the contrary. The trial court so understood and determined, and such is borne out by the record itself. We are of the opinion that the trial court’s determination as to the voluntariness of the appellant’s statement was correct. Luschen v. State, 51 Ala.App. 255, 284 So.2d 282; Crowe v. State, 54 Ala.App. 121, 305 So.2d 396; and Bass v. State, 55 Ala.App. 5, 312 So.2d 576.
“Our careful review indicates that the confession here admitted into evidence was not induced by any type of threat or promise, express or implied, nor was there any inducement which would operate to produce hope or favor, or coercion which would render such confession inadmissible. See Guenther v. State, 282 Ala. 620, 213 So.2d 679; Gamble v. State, 48 Ala.App. 605, 266 So.2d 817; and Johnson, alias v. State (Ala.Cr.App.), 355 So.2d 1160 (1978).
“The appellant’s confession was properly admitted into evidence.”
II
Appellant asserts that reversible error occurred during closing argument, wherein the assistant district attorney made refer-, ence to the jury’s “taking themselves away from the sterile atmosphere of the courtroom, these armed bailiffs and everybody else.” (R. 126-130) Here, the State’s attorney had begun this aspect of his argument by stating, “Try to place yourselves back there at that apartment.” The trial court had sustained objection to this statement with reference to placing the jury in the apartment and the State’s attorney promptly changed this line of argument.
Two other instances of alleged error are called to our attention wherein the assistant district attorney stated that, “When this man comes into your home, with your wife and baby there, and sticks a gun in your face . . . .”
This was a proper and reasonable inference from the evidence and was therefore legitimate argument.
The other instance referred to by counsel is where the assistant district attorney referred to the appellant as a “walking time bomb, a potential killer,” to which the court sustained objection and indicated to the jury that they would be instructed in the charge on consideration of the evidence.
Likewise, moments later, the trial court sustained objection to “sticking a gun in my wife’s stomach.”
We have carefully noted that in the record the trial judge indicated to the jury to only consider evidence coming from the witness stand, and the argument of the attorneys and their observations were not to be considered as evidence. Statements to this effect are found in several places in the record. Further, in the trial court’s oral charge, the following appears (R. 133-134):
“. . . But, the law says in passing on the guilt or innocence of the defendant, you are confined to the evidence that you *1284 have heard from this witness stand or evidence that has been offered in evidence through the agency of witnesses— the exhibits, in other words. You should not go outside of what you’ve heard here or what is offered in evidence except, almost needless to say, naturally you are going to use your own common sense that you have gained in your everyday affairs of life — probably more important than anything else — and, use that common sense when you retire to deliberate in the jury room.
“Now, the law says this, ladies and gentlemen. That you all are the judges and the sufficiency of the evidence, the credibility of the witnesses, and you determine the weight of the evidence, you are just the sole and exclusive judges of the evidence. And, in determining what weight you will put on the testimony of a witness you, of course, can consider many things. Just like you do in your everyday affairs of life. It’s nothing more than you do every day when you are talking to someone or someone wants you to do something and you look at them and you determine what credibility you can put on them, what weight you carry on their words, and, in other words, it’s just how much you can depend on people, that’s what it’s all about. But, as I started to say, in determining the weight that you would attach to a witness, you can consider any ill-will he might have, any interest they might have, or any bias. In fact, you can consider any relationship which, if, in your minds, it would tend to keep a person from testifying to the truth.
“Also, just like in your everyday affairs of life, you look at the appearance and demeanor of a witness on the witness stand in determining what weight or credibility you might accord that testimony.”
There are no firm legal standards by which the prejudicial qualities of improper remarks by a prosecutor during trial can be gauged. Each case must be reviewed on its own merits. Smith v. State, 282 Ala. 268, 210 So.2d 826; Edson v. State, 53 Ala.App. 460, 301 So.2d 226 (1974).
We note that, in three of the four instances referred to, the trial court promptly sustained the objection, and either later admonished the jury or asked them to disregard it.
It is true that it is desirable for the trial court in sustaining the objection to admonish the jury at that time to disregard that comment. Atchison v. State, Ala.Cr. App., 331 So.2d 804, cert, denied, 331 So.2d 806, but in light of the total instruction shown by this record and the oral charge of the trial judge, we cannot ascribe error to the record here presented. Lamar v. State, Ala.Cr.App., 356 So.2d 680 (1977).
We are of the opinion that reversible error has not been shown. The judgment is due to be and the same is hereby
AFFIRMED.
All the Judges concur.