266 So.2d 817

**Roland Colquitt GAMBLE, alias**

**v.**

**STATE.**

**7 Div. 144.**

Court of Criminal Appeals of Alabama.

Aug. 15, 1972.

Rehearing Denied Sept. 12, 1972.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

James F. Hinton, Gadsden, for appellant.

TYSON, Judge.

The indictment charges murder in the first degree to which the appellant entered pleas of not guilty and not guilty by reason of insanity. The jury found the appellant guilty of murder in the second degree and judgment set sentence at thirty years imprisonment in the penitentiary.

As witness for the State, Alabama State Trooper Ronald Ogletree testified that on Easter Sunday, April 11, 1971, he and Auxiliary State Trooper Ormand Watkins were on routine patrol in Etowah County, Alabama. While patrolling along a road known as Steel Stallion Road, they met an automobile driven by the appellant. According to Ogletree, appellant was driving at a slow rate of speed and was weaving across the center line and off the shoulder of the road. Ogletree turned the patrol car around and followed appellant's vehicle for approximately one-half mile before turning on the flashing blue light on the top of the patrol car, signalling the appellant to stop. He also said he blew the car horn to get appellant's attention.

Appellant turned off of Steel Stallion Road onto Pineview Circle, then pulled into a driveway of a private residence, the officers pulling in behind him. Appellant got out of his car and began walking toward the carport of the house. Officer Ogletree ordered appellant to halt, which he did, and according to Ogletree, appellant "staggered" back to his car. Ogletree then asked to see appellant's driver's license, which he produced. Ogletree observed several beer cans inside appellant's car and, detecting a strong scent of alcohol on appellant's breath, informed him that he was under arrest for driving while intoxicated.

The record reflects that the following then transpired. Ogletree asked appellant to step around to the right-hand side of the patrol car, to place his hands on top of the car, and to spread his legs. A search of the appellant's person then ensued, revealing only a pocket knife. Appellant then asked if he could make a telephone call, and Ogletree said he could not, but that he would be allowed a phone call at the jail.

During this time Auxiliary Trooper Watkins was standing behind Ogletree and the appellant on the right-hand side of the patrol car. Ogletree testified that at that point appellant turned and started to run toward the street; that he grabbed appellant by the collar, causing appellant to fall backwards; and that he, along with Watkins, raised the appellant off the ground and held him against the right side of the patrol car. Trooper Watkins told the appellant "not to try that again," and appellant appeared to relax. But when Trooper Ogletree attempted to handcuff the appellant, a scuffle ensued and during the confusion Ogletree's hat was knocked over his eyes, blocking his vision momentarily. When his vision was again clear, he saw that appellant had his arm around Watkins' waist. At that point Ogletree said, "Ormand, watch your gun," and Watkins, feeling for his gun, replied, "God, he has got it."

Ogletree testified that he heard two shots; that he heard Watkins cry out after the first shot; and that he felt the second shot. Ogletree, wounded in the shoulder, staggered back and fell into a ditch, and, looking back toward the car, saw Watkins move away from the patrol car and fall nearby to the ground.

It was Ogletree's testimony that the appellant then got into the driver's seat of the patrol car; that he (Ogletree) fired a few shots at appellant while the car was sitting still; and that appellant then backed out of the driveway and drove toward the Steel Stallion Road. As appellant fled down the road, Ogletree continued to fire his gun at the patrol car but never hit the appellant.

Ogletree then ran across the road to a house trailer and asked a Mr. Dietz for help. Then, glancing up the road, he saw the patrol car turn around and start back toward him. Ogletree stated that he screamed for Watkins to run; that he observed appellant get out of the State vehicle, get in his own car, and drive away in the direction of Steel Stallion Road.

By use of the patrol car radio, and assistance rendered by Mr. Dietz in telephoning the Highway Patrol, help was obtained for the injured Ogletree. Trooper Watkins died from internal hemorrhaging resulting from the gunshot wound.

Following the incident, the appellant remained at large overnight and was apprehended at his home the following morning and taken into custody by State troopers. The weapon taken from the trooper, a thirty-eight caliber revolver, was found in a lake behind appellant's house.

Appellant took the stand and testified in his own behalf. He stated that on the morning of the date in question he had gone to church and returned home to have lunch with his family. Later that afternoon, between 4:30 and 5:00, he drove into St. Clair County and purchased a six-pack of beer. While returning home he consumed either two or three beers.

He stated that he first noticed some headlights behind him after turning off of Steel Stallion Road onto Pineview Circle. When he turned into his sister's driveway, he saw the State Trooper's car pull in behind him. He stated that he got out of the car and started walking toward the carport; that he stopped and turned around when the troopers got out of their car and told him to "hold it"; and that when asked to produce his driver's license he did so.

Appellant testified that Trooper Ogletree then grabbed him, pushed him up against the patrol car and searched him. He stated that the trooper in addition to taking his pocketknife, took his "brand new" watch. According to appellant, Ogletree then told him, "you are going to jail," at which time Trooper Watkins opened the front door of the patrol car. At that point, appellant said that he became frightened and started crying; that he informed the officers that he wanted to make a telephone call and started running, but that Ogletree grabbed him around the chest, and Trooper Watkins came over and the two troopers threw him against the patrol car, causing him to fall backwards and strike his head on the panel of the car door. He further stated that Trooper Watkins picked him up from the ground and "was knocking me up against the car, saying, you son-of-a-bitch, you had better not try

that no more." Appellant testified that while Trooper Watkins had the appellant against the car in this position, he heard Trooper Ogletree say, "Get your gun Ormand." Appellant stated that he had his hands around Watkins' hand and gun and that at the same time Trooper Ogletree was pulling on his (appellant's) arm. In sum, all three men were wrestling over Trooper Watkins' gun which was still in Watkins' holster.

Appellant's testimony was that the gun discharged four times during the struggle, and that he could feel the gun in his hand when it fired. He stated that after the gun discharged, the troopers pushed him away and began running; that he became scared and got into the patrol car; that he heard shots while backing out into the road; and that after driving a short distance up the road, he turned the car around and returned to get his own car.

He stated that he drove straight home, not realizing that anyone had been wounded or killed. Appellant admitted throwing the trooper's thirty-eight caliber revolver in the lake behind his house.

I

Appellant first questions the propriety of the trial judge's action in assuming that a waiver of counsel form, admittedly signed by the appellant, was in evidence when the same was never formally introduced in evidence by the prosecution.

Although the appellant is correct in his contention that the record does not reflect any formal offering of the waiver form in evidence, we are of the opinion that said form was properly considered as evidence in the case. In support of our holding, we quote from Kabase v. State, 31 Ala.App. 77, 12 So.2d 758:

" 'Demonstrative or real evidence, or evidence by inspection, is such evidence as is addressed directly to the senses of the court or jury without the intervention of the testimony of witnesses, as where var-

ious things are exhibited in open court.' 32 C.J.S., Evidence, p. 454, § 601; Underhill's Criminal Evidence, 4th Ed., pp. 148, 168, Sections 115, 125; Chamberlayne Trial Evidence, Tompkins 2nd Ed., pp. 603, 613, Sections 632, 642; Wigmore on Evidence, Vol. 1, p. 222, Sec. 24, Vol. 2, p. 672, Sec. 1151; Wigmore's Code of Ev., p. 223, Rule 136; 20 Am. Jur., p. 600, Sec. 716; Jones Evidence, Vol. 3, p. 2518, Sec. 1376. The tenor of its proffer is immaterial. It becomes evidence—the fact it imports—when it is properly identified and exhibited before the jury in open court for their inspection. Of such import are the foregoing authorities.

. . . . . .

"The shoes of the prosecutrix, having been produced, identified and exhibited in open court to the jury for their observation and the witness interrogated about them, were in evidence in the case. That is, as Professor Wigmore puts it, they were 'thus Evidence, in the sense that Evidence includes all modes, other than argument, by which a party may lay before the tribunal that which will produce persuasion. It is something more than and different from Testimonial or Circumstantial Evidence, and it is to be included among the kinds of Evidence in the broader sense of that term.' Wigmore on Evidence, 2nd Ed., Vol. 2, Sec. 1150, pp. 671, 672."

The record in the instant case indicates that the waiver of counsel form was produced in open court, identified by Captain James A. Davis, who testified that he was present when the appellant read and signed said form, and marked for identification as State's Exhibit No. 10. At no time during any of this did appellant voice an objection. The waiver form appears in the record (R. pp. 90–91), and was before the jury for their consideration.

We conclude that the waiver of counsel form was before the trial jury and considered as evidence in this case. See Davis v. State, 35 Ala.App. 144, 44 So.2d 275; Taylor v. State, 249 Ala. 130, 30 So.2d 256; Kabase v. State, supra.

## II

Appellant next contends that he was not adequately advised of his *Miranda* rights, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, thus rendering the admission in evidence of his alleged confession reversible error. In particular, appellant urges that we consider the sufficiency of the waiver of counsel form, contending that said form fails to show an affirmative waiver of his constitutional rights.

The waiver of counsel form appears in the record as follows:

## "WAIVER OF COUNSEL BY DEFENDANT IN CUSTODY

"I, Roland Colquitt Gamble, have been informed by the undersigned law enforcement officers, prior to being questioned by them, that I am suspected of the offense of *Murder and assault with intent to murder* in Etowah County, Alabama, on the 11th day of April, 1971, and have been informed by them of my rights as follows:

"1. That I may remain silent and do not have to make any statement at all.

"2. That any statement which I might make may be used against me in Court.

"3. That I have a right to consult with an attorney before making any statement and to have such attorney present with me while I am making a statement.

"4. That if I do not have enough money to employ an attorney, I have the right to have one appointed by the Court to represent me, to consult with him before making any statement, and to have him present with me while I am making a statement.

"5. That if I request an attorney, no questions will be asked me until an attorney is present to represent me.

"After having my rights explained to me, I freely and voluntarily waive my right to an attorney. I am willing to make a statement to the officers. I fully understand my rights to an attorney and I have (read—had read to me) this waiver of Counsel and fully understand it. No threats or promises have been made to me to induce me to sign this Waiver of Counsel and to make a statement to the officers.

"This the 12th day of April, 1971, 8:10 A.M.

"/s/ Roland Gamble

"All of the Rights in the above Waiver of Counsel were read and explained to the above defendant by me and he freely and voluntarily waived his right to an attorney. No threats, promises, tricks, or persuasion were employed by me or anyone in my presence to induce him to waive his rights to an attorney and to make a statement without an attorney. He freely and voluntarily signed the above Waiver of Counsel in my presence after having (read—had it read).

"Name /s/ James A. Davis
Title Capt. Ala. State
Investigator

"Witnessed by:

"/s/ L. N. Hagan Sgt.

"/s/ C. T. Barnett "

Appellant's now rather novel contention is that he never agreed to be *interrogated* without the presence of counsel, but only to make a *statement* before consulting with counsel. This distinction drawn by appellant can best be stated by quoting from his brief:

". . . The waiver specifically waives the presence of Counsel for the purpose of making a statement. It does not make the prisoner in custody fair game for any interrogation on the part of the officers. Looking at the waiver and construing most strongly against the State, and in reviewing the record of the manner in which the statement was prepared (TR. p. 146), there can be no question but that the use to which the waiver was put was far beyond the stated purposes in the waiver. To make a statement would be to give one's own version of a happening or an occurrence without being subject to interrogation or questioning about the matter. The interrogating officers and the State in the use of this waiver by a contract with the Appellant, agreed that he could make a statement without Counsel being present and nothing further. . . . It is apparent that a man of reasonable intelligence would, in most cases, be willing to make a statement, but not be willing to be interrogated, after having acquired the most elementary understanding of his rights."

The record here establishes that the appellant was a high school graduate, attended trade school, and that his testimony indicates him to be a man of average understanding and intelligence. We therefore do not feel compelled to comment upon this distinction drawn by the appellant in brief inasmuch as it is clear that the fifth listed right, in the above quoted waiver form, sufficiently advised the appellant of his right to have counsel present before answering any questions.

■ Appellant is correct in his assertion that it is the totality of the circumstances which determines an effective waiver of one's constitutional rights. Miranda v. Arizona, supra. In that regard, we point out that the appellant received his *Miranda* warnings on at least three occasions by two different officers.

At the time of his arrest, appellant was advised of his rights by Sergeant L. N. Hagan of the State Department of Public Safety. The record shows the following:

"Q All right. Now, when you got to the Gamble house, what, if anything, did you observe?

"A I observed Trooper Curry, Auxiliaryman Dollahite, and a lady who I found to be Mrs. Gamble, Roland Gamble's mother, and Roland Gamble.

"Q Was Capt. Davis there at that time?

"A No, sir.

"Q You got there prior to his arriving?

"A Yes, sir.

"Q Now, what, if anything, did you do there?

"A I asked Trooper Curry what he had done and he said he had placed him under arrest for murder. ·

"Q Was this in the Defendant's presence?

"A Yes, sir.

"Q And said he placed him under arrest for murder?

"A Yes, sir.

"Q Where was the Defendant at that time?

"A He was sitting in the patrol car with the door open and his feet on the ground.

"Q Is that on the passenger side?

"A No, sir, it was on the driver's side.

"Q The Defendant was sitting on the driver's side?

"A Yes, sir.

"Q That is, the Defendant Roland Gamble.

"A Yes, sir.

"Q What did you do, if anything?

"A I advised him of his constitutional rights.

"Q Do you recall what you said to him?

"A Yes, sir, I read it from a card.

"Q Would you tell us what you read to him.

"A I read, 'You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.'

"Q And after you read these to him did you ask him any questions?

"A I asked him did he understand what I had read to him.

"Q What did he say?

"A At that point he said he did not.

"Q What, if anything, did you do?

"A I read them to him again, one at a time, and asked him did he understand each sentence as I finished.

"Q Now, by one at a time, do you mean each one of the rights that you just enumerated there from that card?

"A Yes, sir.

"Q You read them individually?

"A Yes, sir.

"Q And you say you asked him if he understood each one individually?

"A Yes, sir.

"Q All right. Did you ask him if he understood it after you advised him of each individual right?

"A Yes, sir.

"Q And not after you read the whole thing.

"A I did it both ways. After—the second time I read it to him I asked him did he understand after I read each individual right. When I finished, I asked him, 'Do you understand all of these rights?' And he said he did.

"Q All right, what was his response to each individual question?

"A I asked him, 'Do you understand this?' after I read it to him and he said, 'Yes, sir.'

"Q That is each one, each individual right.

"A   Yes, sir.

"Q   And then, after you got through you asked him if he understood all of the rights.

"A   Yes, sir.

"Q   And he said he did?

"A   Yes, sir.

"Q   Then, what did you do?

"A   I asked his mother, Mrs. Gamble, did she understand what I was saying, I don't remember if she gave an indication.  Anyway, I handed her the card and asked her to read the card.

"Q   Did she read it in your presence?

"A   Yes, sir."

Captain James A. Davis, through whom the written confession was admitted, testified that he advised appellant of his *Miranda* rights prior to interrogation at the Etowah County Sheriff's office.  His testimony, which includes a "pre-*Miranda* predicate" was as follows:

"Q   State your full name, please, sir.

"A   James A. Davis.

"Q   And your position.

"A   Captain of the Alabama Department of Public Safety, assigned to Investigation and Identification Division.

"Q   Were you assigned to Etowah County, Alabama, on April 12, 1971?

"A   Yes, sir, that is one of my counties.

"Q   On this date did you have occasion to interrogate this Defendant, Roland Colquitt Gamble?

"THE COURT:  Can y'all hear all right?  I can barely hear you.

"A   Yes, sir.

"Q   All right.  Now, where did this take place?

"A   In the Etowah County Sheriff's office.

"Q   Were you present when the waiver which is in evidence now was signed by the Defendant?

"A   Yes, sir.

"Q   Was this prior to or subsequent to the interrogation?

"A   Prior to the interrogation, sir.

"Q   All right, sir.  Did you discuss with the Defendant his constitutional rights?

"A   Yes, sir, I did.

"Q   And was this prior to the interrogation?

"A   Yes, sir.

"Q   Did you go over the same rights that are listed in this waiver?

"A   Yes, sir.

"Q   All right, sir.  Did the Defendant acknowledge whether or not he understood those rights?

"A   He did, and he read it himself, sir.

"Q   All right, sir.  Now, did you make any threats towards the Defendant—

"A   No, sir.

"Q   —concerning making a statement?

"A   No, sir.

"Q   Did you promise him any reward or hope of reward if he should make a statement?

"A   No, sir.

"Q   All right.  Did you give him any inducement to make a statement to you?

"A   No, sir.

"Q   All right, sir.  Did you advise him he could have an attorney present if he wanted to?

"A   Yes, sir.

"Q   Did he request one?

"A   No, sir.

"Q After you had gone over these matters with him and after he signed this waiver that has been introduced into evidence did he in fact make a statement to you?

"A Yes, sir.

There was further evidence in the record, although denied by the appellant, that the appellant had affirmatively stated to Officer Davis that he did not wish to consult with an attorney.

█ Thus, the appellant was advised of his constitutional rights at the time of his arrest, on his arrival at the Etowah County Sheriff's office, and again just prior to his making the inculpatory statement which was introduced at trial. The record further shows that appellant was at no time threatened, induced, or coerced into making an incriminating statement.

While appellant now contends that he did not understand his rights, we are of the opinion that the warnings given appellant were complete and accurate, and the record clearly shows that appellant expressly, voluntarily, understandingly, and intelligently waived those rights.

Having searched the record, as we are required to do, and finding no error therein, the judgment of the court below is due to be and the same is hereby

Affirmed.

CATES, P. J., and ALMON and HARRIS, JJ., concur.

CATES, Presiding Judge (concurring).

At first blush I thought we were running afoul of Square v. State, 283 Ala. 548, 219 So.2d 377, because the appointment of counsel for an indigent was expressed in terms of the future, i. e., after the defendant would be brought to court. The present form is no model to emulate.[1]

However, after reviewing the other Alabama appellate court opinions[2] I conclude that *Square,* supra, is to be confined strictly to identical facts. The Fifth Circuit cases (one of which is cited in *Square*) are not uniformly persuasive. People v. Williams, Ill.App., 264 N.E.2d 901.

Moreover, I consider that numbered paragraph 5 of the waiver signed by Gamble clearly points out that the officers will not interrogate until an attorney is present if the suspect asks for one.

ALMON, TYSON and HARRIS, JJ., concur.

---

1. I am not impressed with appellant's purported interpretation of "statement" as distinguished from a response to a question.

2. See Green v. State, 45 Ala.App. 549, 233 So.2d 243, for a partial list.