Billy Ray Williamson was indicted under Alabama's Death Penalty Statute (Act No. 213, General Acts of Alabama, 1975, Title 15, Sections 342 (3)-342 (11), Code of Alabama 1940, as amended)[1] for the kidnapping and first degree murder of one Jessie Davenport. The jury found the appellant guilty as charged, and the trial court thereafter conducted a post-conviction hearing on the aggravating and mitigating circumstances, as required by law. The trial judge then set punishment at death by electrocution.
Mary Ann Griffin testified that on April 25, 1977, she was employed by Dr. Felton Davenport as a receptionist. Miss Griffin stated that on this date, around 7:40 a.m., she arrived at work. As she got out of her car, Mr. Jessie Taft Davenport (the deceased) called her over to his truck. She walked over to Mr. Davenport's truck and noticed that the appellant was seated with him. Mr. Davenport asked her to tell his son, "Doc" Davenport, that he would be at the Kimberly Trailer Court with the appellant, working on a little problem which had arisen. Williamson, according to Miss Griffin, was resident manager at the trailer park.
June Knox stated that she lived at the Kimberly Trailer Park in Decatur, Alabama, on April 20, 1977. She stated that on this date she saw "Pop" Davenport, along with the appellant and another man, around 8:30 a.m., working at the park's treatment plant.
Judy Smith indicated that she was a dental assistant, employed by Dr. J. Felton Davenport. Miss Smith stated that on April 25, 1977, around 10:45 a.m., she received a telephone call at the dental office. When she answered the phone, the caller asked to speak with "Doc" Davenport about his father. According to Miss Smith, she buzzed "Doc" Davenport back in the lab and he answered the call.
Dr. J. Felton Davenport testified that he had known the appellant since 1971 and that the appellant had been employed by him and his father for several years as a "handy-man" before he became the resident manager of the trailer park. Dr. Davenport stated that he received the phone call on April 25, 1977. He stated that the caller was holding his father for ransom and told him if he contacted the police he would never see his father again. Dr. Davenport related that the caller said he would give further instructions to him later and then hung up the phone. Dr. Davenport testified that he notified the police.
Dr. Davenport indicated that around 7:20 p.m. that same day he received a second phone call at his residence. The voice sounded to him as if it were the same man with whom he had spoken earlier in the day. Dr. Davenport related that he was told by the caller to go to a cabin at Rivermont Oaks (a new subdivision) and place $100,000.00 in a brochure box, then wait. According to Dr. Davenport, the voice on the phone was not that of the appellant.
Mrs. Doris Seibert testified that she was employed as a bookkeeper for Dr. Davenport. She stated that on April 25, 1977, around 11:00 a.m., she and Marie Aldridge (her assistant) left the office to look for Mr. Davenport. They found his truck in the Southland Plaza Shopping Center parking lot in Decatur, Alabama, around 11:45 a.m.
Andrea Jane Loosier testified that she lived at Lot No. 22, Kimberly Court, in Decatur, Alabama. Mrs. Loosier stated that on April 25, 1977, around 8:00 p.m., she went to the appellant's trailer to dry some clothes. While there Mrs. Loosier indicated that the following occurred (R. pp. 582-585):
 "Q. Would you relate to the ladies and gentlemen of the jury the facts and substance of this conversation that you had with the defendant there in his trailer on the night of Monday, April 25, 1977? *Page 1057 
 "A. Well, I was sitting there while my clothes dried and I had made a phone call, had used their phone to make a phone call and the television was on and Mr. Williamson said to me `Would you do me a favor' and I said, `I will if I can,' and he said, `Would you pick up a package for me? You know, I thought the post office or something is all that run through my mind at the time and I said, `Where do I have to go?' He said, `A little ways out of town.' You know, then that confused me and I said, `What is it?' He didn't give me no answer then and so I asked him why he didn't go after it and he said that his car and truck had already been seen around town too much and I said, well, I didn't know where to go or anything and he said he would tell me where to go. I said, `Well, if I go is there anything in it for me?' And he said, `A hundred dollars.' So, immediately my mind related to drugs, narcotics being in a package that would be out in the woods some place is what came to my mind and so I said to him, I said, `Well, is it drugs in there? Is it drugs what it is?' He never really said yes, but he — during the conversation he let me believe that it was narcotics in the package until the time that I heard it on the radio I —
"MR. BUTLER: We object, Your Honor.
"THE COURT: All right. Stop at that point.
"Q. Tell us the substance of the conversation.
 "A. Well, I thought it was — like I said, I thought it was narcotics in a package. So, I told him, I said, `Well, can you get any time for it,' and he said, `About twenty years in the pen,' so that made me even more believe it was narcotics. So I told him, I said, `Bill, man, that ain't no way to go, not drugs,' and he said, `Well, I got to pay these bills some way or got to have some money some way.' I am not really sure exactly of the words, and so he said, `Would you do it for two hundred dollars?' Then at this time he said that he would go with me and that all I would have to do is just drive the car, back it up and he would get out and get this package and get back in the car. For two hundred would I go for the two hundred dollars. I said, `No, I need the money but I can't use no twenty years in the penitentiary for getting caught,' and I said, `What if you got caught out there,' and he said, `Well, if you go and we get caught, I have never seen you and I don't know who you are and run like hell.' So, at that time I refused. I still wouldn't go and I got up and left at this time."
Mrs. Loosier indicated that she telephoned a woman friend who worked for the Police Department on April 28, 1977. Two detectives came to see her. Mrs. Loosier advised that she informed the two of them of what had transpired between the appellant and herself.
Bobby Ray Albrecht testified that on April 25, 1977, the appellant came to his trailer around 10:00 p.m. Albrecht stated that the appellant told him that he wanted to take a ride, so the two of them got in Albrecht's car and drove off. The appellant gave directions, and this ride ended near Rivermont Oaks. The appellant stated that he was going to take a walk and for him to be back within twenty minutes. Albrecht stated that he drove about for twenty minutes and upon his return the appellant got in the car and told him to hurry up and drive. He did so, and they went back to the trailer park.
Albrecht testified that on Tuesday, April 26, 1977, around lunch time, Williamson came to his trailer while he was playing cards with some friends. The appellant sat down for a few minutes and then left. Albrecht stated that around twenty-five minutes later his friends left and he went to appellant's trailer to find out what he wanted. Albrecht indicated that Williamson was outside his trailer and the following conversation took place (R. p. 597):
 "A. He asked me if I wanted to make twenty-five thousand dollars. Said all I had to do was make a telephone call and tell him where to deliver the money and pick it up and bring it back to him and he would count me out twenty-five thousand dollars then." *Page 1058 
Albrecht testified that he told the appellant he would think about it and he never saw him again.
Wallace L. Higgins testified that he was employed as a special agent with the Federal Bureau of Investigation, Gadsden, Alabama, Division. Higgins stated that on Wednesday, April 27, 1977, he went to the home of Bradley Eugene Jackson in Fort Payne, Alabama. There Higgins conducted a search of a 1969, bronze colored Dodge Charger at this residence. In searching the vehicle, Higgins indicated he found a paper bag which contained a light blue shirt and two sport coats.
Brent Wheeler testified that he was employed as criminologist by the State of Alabama for the Department of Toxicology and Criminal Investigation. Wheeler advised that he participated in the search of a 1969 Dodge Charger in Fort Payne, Alabama, on April 27, 1977. He stated that one white canvas shoe, one blue shirt, one three-quarters by eighteen and one-half inch pipe, one R.C. drink bottle, one brochure map of Rivermont Oaks, and one piece of a trunk mat, all of which had blood stains on them were found in the automobile. Wheeler stated that he also removed some hair from the trunk of the automobile. He indicated the hair in the trunk matched that of Jessie Davenport. All of these items were later turned over to Toxicologist Martha Odom.
James Wayne Kyker, a detective with the City of Decatur, testified that he participated in the investigation of Jessie Taft Davenport's disappearance. This investigation led him to a wooded area in Cullman, Alabama, where he found the body of Jessie Taft Davenport.
James M. Buttram, State Toxicologist, testified that on April 28, 1977, he conducted a post-mortem examination of Jessie Taft Davenport. Buttram related that Davenport's death was the result of multiple blunt force blows delivered to the head which caused multiple breaks or fractures, resulting in hemorrhaging within the skull.
Martha Odom, State Toxicologist, testified that she examined the tennis shoe, blue shirt, piece of pipe, R.C. drink bottle, and trunk mat found in the 1969 Dodge Charger belonging to Bradley Eugene Jackson. Mrs. Odom stated that the blood type found on the items matched that of deceased.
Dr. J. Felton Davenport was recalled and stated that the piece of pipe found in the 1969 Dodge Charger was the same pipe used to shut off sewage drainage from Kimberly Court at the treatment plant.
Kenneth D. Collier testified that he was a police officer with the City of Decatur. Collier related that he took Williamson's confession on April 30, 1977, at Police Headquarters. Detective Robert Clark assisted Collier by reading the appellant his "Miranda" rights. The appellant responded that he understood them. The appellant, according to Collier, then read over and signed a voluntary waiver of these rights. Collier related that there were no threats, coercion, intimidation, or inducement made or offered the appellant in order to obtain this statement or to sign the waiver of rights form. Williamson, according to Collier, never mentioned wanting a lawyer. Collier stated that Williamson admitted hitting Davenport with a pipe on the head and that Bradley Eugene Jackson was his partner in the kidnapping of Davenport.
Mrs. Coralee Williamson, mother of appellant, testified that her son came to her home in Fort Payne, Alabama, on Saturday, April 30, 1977. Mrs. Williamson stated that the appellant was wet, muddy, unshaven, and acted as if he were in "a shock of mind." The appellant, according to his mother, left with his brother, Jim Williamson, a deputy sheriff of DeKalb County, after he drank a cup of coffee.
Jim Williamson, Deputy Sheriff of DeKalb County, testified that he placed his brother under arrest on April 30, 1977, at his mother's home in Fort Payne, Alabama. Jim Williamson stated that he took the appellant to DeKalb County Sheriff Ables' home. In route, the appellant told Jim Williamson that he needed a good lawyer. While at Sheriff Ables' home, Jim Williamson indicated that the Sheriff advised the *Page 1059 
appellant of his "Miranda" rights also. Jim Williamson indicated that the three of them then drove to Decatur, Alabama, stopping only to eat dinner at a small cafe in Scottsboro, Alabama.
After their arrival at Decatur City Hall, Jim Williamson was allowed to talk with the appellant privately in the narcotics room for a few minutes. Jim Williamson testified that when he came out of this room he told Detective Ward that the appellant wanted a lawyer and that Ward stated that they would read his brother his rights again. Ward did not testify at trial.
Billy Ray Williamson, the appellant, testified at the suppression hearing. He indicated that he could read and write a few small words and was blind in one eye. The appellant said that he had only a few hours sleep during the three days before he was taken into custody by his brother. Also, he stated that he had spent the two previous nights before his arrest in the woods. The appellant stated that Detectives Collier and Clark did not read him his rights until after he had signed a piece of paper that they directed him to sign. The appellant said he asked for a lawyer and was told by Detectives Collier and Clark that he did not need one and that all he had to do was to sign the paper, then he could get some rest. The appellant testified that when he signed the paper he did not understand that he was giving up his rights against self-incrimination or to have a lawyer present under the United States Constitution. Also, the appellant denied making the statement which he signed.
 I
The appellant contends that the Alabama Death Penalty Statute is unconstitutional because the trial jury could not consider the aggravating or mitigating circumstances, thus the death penalty is mandatory and therefore violative of the Eighth and Fourteenth Amendments to the United States Constitution.
The constitutionality of the present Alabama Death Penalty Statute was upheld by this Court in Jacobs v. State
(Ala.Cr.App.), 361 So.2d 607 (1977); and subsequently upheld inJacobs v. State (Ala.Cr.App.), ___ So.2d ___ (1977), remanded for further proceedings; Ritter and Evans v. State
(Ala.Cr.App.), 361 So.2d 654 (1977); Cook v. State
(Ala.Cr.App.), 369 So.2d 1243 (1977); and Wilson, alias Wilksv. State (Ala.Cr.App.), ___ So.2d ___ (1978). The appellant has not asserted any grounds for invalidating the statute in question which this court has not previously considered, thus we adhere to the views heretofore expressed on this issue.
 II
The appellant contends that the trial court erred in granting the State's challenge for cause as to two prospective jurors.
The pertinent statute covering these challenges provides:
 "57. Additional ground of challenge in certain cases in favor of state. — On the trial for any offense which may be punished capitally, or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person has a fixed opinion against capital or penitentiary punishments, or thinks that a conviction should not be had on circumstantial evidence; which cause of challenge may be proved by the oath of the person, or by other evidence." Title 30, § 57, Code of Alabama 1940, Recompiled 1958, now § 12-16-152, Code of Alabama 1975.
In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776, and recently in Davis v. Georgia, 429 U.S. 122,97 S.Ct. 399, 50 L.Ed.2d 339 (1976), the United States Supreme Court held that unless a venireman is "irrevocably committed, before the trial has begun, to vote against the penalty of death, regardless of the facts and circumstances that might emerge in the course of the proceedings," 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, he may not be excluded.
In his examination, the district attorney asked the following questions of Jimmie Atkins (R. pp. 51-52): *Page 1060 
 "MR. MOEBES: Mr. Jimmie Atkins, do you feel that you would never under any circumstances vote as a juror for a death penalty?
 "MR. MOEBES: Would you refuse to apply the death penalty no matter how strong the evidence and under all circumstances in any case?
"JUROR: Yes, sir.
 "MR. MOEBES: Would you automatically vote against the death penalty without regard to any evidence that might be developed at the trial of the case before you as a juror?
"JUROR: Yes, sir.
 "MR. MOEBES: Would your attitude toward the death penalty prevent you from making an impartial decision as to the defendant's guilt?
"JUROR: Yes."
As to the prospective juror Jacky L. Snow, the trial judge asked the following questions (R. pp. 404-405):
 "THE COURT: That's not the question. The United States Supreme Court says people that don't believe in the death penalty can serve on the jury but there is a question of whether or not you are so strongly against it you are not going to listen to the evidence and not going to inflict it regardless of what the evidence is. Now, do you fit into that category?
"JUROR: I would listen to the evidence given.
"THE COURT: What?
"JUROR: I would listen to the evidence given.
 "THE COURT: Well, after you heard the evidence and it proved — I am not saying it will by any means, but if it proved without a doubt that the defendant was guilty would you vote for the death penalty?
"JUROR: No.
"THE COURT: Pardon?
"JUROR: No.
 "THE COURT: Would you vote to convict if you knew that the inevitable result would be the death penalty?
"JUROR: No.
"THE COURT: All right.
"MR. MOEBES: We challenge for cause.
 "THE COURT: I will grant the challenge. You can be excused unless you are called for another case."
It thus appears from the record that both Atkins and Snow were irrevocably committed to vote against the death penalty regardless of the facts and circumstances that might emerge during the trial. Therefore, the trial court did not err in granting the State's challenges for cause as to these two prospective jurors.
 III
The appellant contends that the trial court erred in refusing to grant a motion for a continuance based on some allegedly highly prejudicial newspaper articles appearing in The DecaturDaily.
One hundred jurors were summoned for jury duty in the trial of this case. The jurors were divided into groups of twelve and each group was interrogated on voir dire as a group, while the remainder stayed in a jury lounge. After voir dire of the fourth group of these jurors, the court recessed until the following day and each prospective juror was allowed to go to his or her home. The next day, Tuesday, August 30, 1977, the appellant made a motion for a continuance based upon the allegedly highly prejudicial newspaper articles appearing inThe Decatur Daily on August 29, 1977.
The trial court, before ruling on the motion, recalled the forty-six prospective jurors remaining and questioned them in regard to the newspaper articles. Twenty of the forty-six prospective jurors stated that they had read the articles. The trial court then asked the following questions after which the trial court asked additional questions of the jurors submitted by appellant's counsel to the trial judge (R. pp. 527-528):
 "THE COURT: All right. Now, the ones who read or saw or heard anything about this case in the news media, please tell me if you saw anything which would affect your opinion or your ability to sit *Page 1061 
in fair judgment on this case. If you saw anything that would affect your opinion the way that you would judge the evidence under the law, please raise your hand.
"(No answer from venire.)
 "THE COURT: Did any of you see anything which you did not already or had not already heard or did not already know about this case in any of these news reports that you might have seen or heard? If so, raise your hand.
"(No answer from venire.)
 "THE COURT: Do each of you feel that you could sit in fair judgment on the evidence in this case and decide it according to the law as given you by the Court after seeing the news reports or hearing the news reports since you were qualified yesterday. If you could not, please raise your hand. If you have been adversely affected by that or by anything else since you were qualified yesterday, please raise your hand.
"(No answer from venire.)
 "THE COURT: Have you had any contact with any — I will ask all members of the group, have you had any contact or come into contact with any information whatsoever of any kind which would change your thinking in regard to how you could sit and judge the evidence in this case?
"(No answer from venire.)
 "THE COURT: Has there been anything adverse to the defendant which has come to your attention by the news media or anything else since you were qualified which would make it detrimental to the defendant in any manner if you sat in judgment on this case?
"(No answer from venire.)
 "THE COURT: Will you be able to give a fair and impartial judgment according to the instructions of the Court at this time if you are selected to serve on the jury?
"(No answer from venire.)"
The trial court has wide discretion in whether or not to grant a continuance and such discretion will not be revised in the absence of a clear abuse of discretion. Jenkins v. State, Ala.Cr.App., 337 So.2d 72 (1976), and authorities cited. Further, the appellant has the burden of showing a prejudicial influence which the publicity has caused before a trial court will be held in error. Mayola v. State, Ala.Cr.App.,344 So.2d 818 (1977); Botsford v. State, 54 Ala. App. 482, 309 So.2d 835, cert. denied 293 Ala. 745, 309 So.2d 844 (1974). Here, the appellant failed to show what, if any, prejudicial effect the newspaper articles had on the prospective jurors. Murphy v.Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589; Dobbertv. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
Each juror indicated that he would render a verdict based solely on the evidence at trial.
Therefore, the trial court did not err in denying appellant's motion for a continuance.
 IV
Appellant next contends that the trial court erred in allowing appellant's signed written confession into evidence. According to appellant, his constitutional rights, as established by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, were violated.
The appellant was taken to the Decatur City Hall by his brother, Deputy Jimmy Williamson, and DeKalb County Sheriff Ables. Williamson testified that before leaving for the Decatur City Hall the appellant told him that he needed a good lawyer after he advised him of his rights (R. p. 816). Also, Sheriff Ables advised the appellant of his rights.
Jim Williamson was allowed to talk with the appellant (his brother) for ten to fifteen minutes in the narcotics office (R. p. 757). Deputy Williamson stated that when he came out of the narcotics office he told Sergeant Ward that the appellant wanted an attorney (R. p. 817). *Page 1062 
Detective Kenneth Collier testified that he and Detective Robert Clark entered the office where the appellant was located after Deputy Williamson came out. There is no evidence that either Ward or Williamson informed Clark or Collier that the appellant wished to speak with an attorney. The appellant was read his constitutional rights once again, this time by Detective Collier (R. p. 758). After Detective Clark asked the appellant if he understood what he had read him and understood his rights, the appellant stated he did and then signed a waiver of rights form (R. p. 759). Also, Collier testified that no one in his presence threatened, intimidated, coerced, or made any promise or inducement to get appellant to sign the waiver form. According to Clark, the appellant at no time expressed any desire to speak with an attorney.
When a person is arrested and asserts his right to counsel, he can change his mind for any reason satisfactory to himself and submit to questioning. United States v. Hodges,487 F.2d 945 (Fifth Cir. 1973); Jennings v. United States, 391 F.2d 512
(Fifth Cir. 1968). The State still has the heavy burden to prove that a person in custody "knowingly and intelligently" waived his privilege against self-incrimination and his right to retained or appointed counsel. Miranda v. State of Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We hold that the State here met this burden in the instant case. The appellant was advised of his constitutional rights on three occasions; he told his brother (Deputy Williamson) that he needed a good lawyer after the first warnings were read to him. It also appears that the interrogating officers, Collier and Clark, were not aware of this request or desire.
There is no contention here that the appellant was denied either food or rest. This is not a case of a long or protracted examination of an accused being held incommunicado and subject to threats or abuse. The record in this cause is entirely to the contrary. The trial court so understood and determined, and such is borne out by the record itself. We are of the opinion that the trial court's determination as to the voluntariness of the appellant's statement was correct. Luschen v. State,51 Ala. App. 255, 284 So.2d 282; Crowe v. State, 54 Ala. App. 121,305 So.2d 396; and Bass v. State, 55 Ala. App. 5, 312 So.2d 576.
Our careful review indicates that the confession here admitted into evidence was not induced by any type of threat or promise, express or implied, nor was there any inducement which would operate to produce hope or favor, or coercion which would render such confession inadmissible. See Guenther v. State,282 Ala. 620, 213 So.2d 679; Gamble v. State, 48 Ala. App. 605,266 So.2d 817; and Johnson, alias v. State (Ala.Cr.App.),355 So.2d 1160 (1978).
The appellant's confession was properly admitted into evidence.
 V
The appellant contends that the trial court committed reversible error by misperceiving its function in the post-conviction hearing under Alabama's Death Penalty Statute.
Title 15, Section 342 (6), Code of Alabama 1940, Recompiled 1958, provides:
 "Determination of sentence by court; court not bound by punishment fixed by jury — Notwithstanding the fixing of the punishment at death by the jury, the court after weighing the aggravating and mitigating circumstances may refuse to accept the death penalty as fixed by the jury and sentence the Defendant to life imprisonment without parole, which shall be served without parole; or the court after weighing the aggravating and mitigating circumstances, and the fixing of the punishment at death by the jury, may accordingly sentence the Defendant to death. If the court imposes a sentence of death, it shall set forth in writing as the basis for the sentence of death, findings of fact from the trial and the sentence hearing which shall at least include the following: *Page 1063 
 "(a) One or more of the aggravating circumstances enumerated in section 342 (8) of this title, which it finds exists in the case and which it finds sufficient to support the sentence of death, and
 "(b) Any of the mitigating circumstances enumerated in section 342 (9) of this title, which it finds insufficient to outweigh the aggravating circumstances. (1975, No. 213, § 4, effective March 7, 1976.)"
At the beginning of the aggravation — mitigation hearing, as required by the Death Penalty Statute, the trial court stated (R. p. 977):
 "THE COURT: All right, we will proceed now with the case of the State against Billy Ray Williamson on the statutory hearing to determine whether or not a sentence fixed by the jury will be altered. Any witnesses that either of you would like to have sworn?"
According to appellant, the trial court's use of the word "alter" and also "change" in a latter part of the proceedings is indicative of the fact that the trial court perceived its function as a reviewer of the jury's determination and not as the sentencing authority.
Judge Harris stated in Jacobs v. State (Ala.Cr.App.),361 So.2d 607 (1977), as follows:
 ". . . Before a death penalty can be imposed in Alabama, the trial judge is compelled to hold a separate hearing and make written findings of one or more of the aggravating circumstances set forth in the Act. If the trial judge fails to find one or more aggravating circumstances, supported by the evidence, he is empowered to alter the verdict of the jury and sentence the defendant to life imprisonment without parole. Since the verdict of the jury is not binding on the trial court the Act cannot under any construction be classed as mandatory."
In the instant case the trial judge found three aggravating circumstances to exits (See Appendix A). The only mitigating circumstance found to exist by the trial court was that the appellant had no history of prior criminal activity. The trial court determined, after reviewing all the evidence presented at the post-conviction hearing, that the death sentence should be imposed. There is nothing in the record to indicate that the trial court did not conduct the hearing in the manner as required by the statute. The mere usage of the words "alter" and "change" in no way contravenes the meaning or purpose of the post-conviction hearing under the Alabama Death Penalty Statute. Jacobs, supra.
 VI
The appellant contends that the trial court committed reversible error by charging the jury on the law of aiding and abetting. Under the Death Statute, the appellant asserts the killing must have been by the defendant and the jury must be so charged in order for the Death Penalty to be applicable.
In Jacobs v. State, supra, Judge Harris stated:
 "Appellant's counsel contend that though he participated in the robbery of the victim he took no part in the actual shooting death of Mr. Knight and, therefore, the death penalty was undeserved. We would remind counsel for appellant that one of the aggravating circumstances in Alabama's new death penalty law is a section which provides:
 "`The capital felony was committed while the Defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit rape, robbery, burglary, or kidnapping for ransom . . .' [Emphasis supplied].
 "The above quoted section squarely fits this case in every respect. Appellant received a fair and impartial trial and that is all that he was entitled to under the law. Death is the penalty of the law, and the penalty is just."
Thus the trial court did not err in its charge to the jury on the applicable law covering aiding and abetting.
In closing, we wish to commend the attorneys representing the appellant and those *Page 1064 
representing the State of Alabama in this cause. This record indicates a diligent and conscientious defense during trial. This case was hard-fought, but the record shows a fair and impartial trial. We also wish to note the excellent briefs and argument made in this Court by these attorneys.
We have carefully examined this record and find no error therein. This case is due to be and the same is hereby
AFFIRMED.
All the Judges concur.
[1] Death Penalty Act is now 13-11-2 through 13-11-9, Code 1975.
 APPENDIX
STATE OF ALABAMA, ) IN THE CIRCUIT COURT OF )
Plaintiff ) MORGAN COUNTY, ALABAMA )
vs. ) CASE NO. CC-77-0210)
 BILLY RAY WILLIAMSON, ) )
Defendant ) )
The defendant has been convicted by a jury after trial of his case on a charge of intentional killing of a human being during the commission of a kidnap for ransom; the punishment was set by the verdict at death. The crime is one of the crimes set forth in Title 15, Section 342 (4) of The Code of Alabama, 1975 interim supplement. Under the mandate of Title 15, Section 342 (5) the court proceeds to a hearing to aid in a finding of facts on which to base a judgment as to whether or not the penalty of death will be allowed to stand, or the defendant will be sentenced to life imprisonment without parole. The hearing was held on September 14, 1977 at 9:00 A.M. at the Morgan County Courthouse. The defendant with his employed counsel were present in open court; the District Attorney for the 8th Judicial Circuit of Alabama was present representing the State of Alabama. Both the State and the defendant were given an opportunity to introduce evidence. The defendant introduced two witnesses who gave evidence tending to show that the offense in question was committed while the defendant was under the influence of emotional stress by reason of his concern over a serious physical ailment of his wife, and his need for a large sum of money to pay for her medical and hospital bills. It was stipulated and agreed by and between the State of Alabama and the defendant through his attorney that the defendant has no significant history of prior criminal activity. The State offered no evidence. Both the defendant's attorney and the District Attorney argued the case.
The court finds that the defendant, Billy Ray Williamson, was 42 years old at the time of the offense. He had little formal education, but he was a reasonably intelligent and well oriented individual and was not demented. He was well known to the victim, Jessie T. Davenport, and was a trusted employee of Felton Davenport. Felton Davenport was a son of the victim, Jessie T. Davenport. Felton Davenport owned and operated a trailer home park in Decatur, Alabama, and he was developing a subdivision outside the City of Decatur. He was engaged in the practice of dentistry, *Page 1065 
and the victim, Jessie T. Davenport, worked in a supervisory capacity in the trailer home park. The defendant was employed as a superintendent of the park, and he worked almost daily with the victim, Jessie T. Davenport. Their relationship was on a very friendly basis; it appears that each considered the other as a close friend. About one week before the crime the defendant devised a plan to kidnap the victim and secure a ransom of $100,000.00 from Felton Davenport, the victim's son. The motivation for the offense was the desire to obtain the ransom money. He needed a large sum of money to pay the medical and hospital expenses for his wife, but in his statement which was introduced into evidence he did not give this as the reason for the commission of the offense, but stated in general that he wanted the ransom money. There is no explanation throughout all of the record of this case of why he determined to make an apparent good friend the victim of his crime.
The defendant conspired with another person to execute his plan. The two drove to the vicinity of the victim's home early one morning and sat in their car in view of the victim's house until the victim drove away from the house apparently on his way to work. The two stopped the victim, and the defendant got into the victim's truck to ride to the trailer Park where both worked. They went by the dental office of Felton Davenport and talked for a short time with another employee of Felton Davenport, who testified that the defendant and the victim were together at this time. The victim drove to the Trailer Park, and went to the sewage processing plant of the park to perform some work on this small plant. The co-defendant was seen in this area shortly after the defendant and the victim arrived. After a few minutes at this sewage disposal plant the defendant without words with the victim wilfully struck the defendant a violent blow on the side of the head with an instrument which the jury could have found was a three quarter inch iron pipe about eighteen inches long. The victim was immediately knocked unconscious, and the defendant either alone or being assisted by another, threw the victim into the trunk of the automobile of the co-defendant. The defendant drove the truck of the victim to a shopping center near the office of Felton Davenport and abandoned it there. He got into the automobile with the co-defendant, and the automobile was driven by the co-defendant while the defendant and the co-defendant searched for a place to dispose of the body. The body was eventually taken to an isolated wooded area in Cullman County several miles from the trailer Court where the first blow was struck. There was evidence that more than one blow was struck to the head of the victim. The victim died from numerous blows to the head; there were fractures of the skull, lacerations at several places on the scalp, and masses of blood on the brain resulting from the blows. The body was dropped from a rock formation and was abandoned. There was evidence that the automobile in which the body was transported to the scene where it was abandoned was partially cleaned by the removal of several articles from it; these articles were found in the vicinity of the body.
After the body was abandoned the defendant directed that a telephone call be made to Felton Davenport, the son of the victim, and that he be advised that the victim had been kidnapped and that he should not notify law enforcement officers, but that he should await for further instructions. Several hours after the first call was made the defendant directed another telephone call be made to Felton Davenport demanding that he leave $100,000.00 at a designated spot, and advised directly or implicitly that this would be necessary in order for the victim to be safely released. At the time of the telephone call the victim was already dead. The defendant attempted to secure two other persons to pick up the ransom money promising to pay them, but not advising them what would be in the package. Each declined. The body was found, and the defendant absconded. After an intensive search for the defendant was under way he surrendered himself at the home of his parents where he had been for *Page 1066 
only a short time to Sheriff's Deputy of DeKalb County; the Deputy was the defendant's brother. On being questioned by law enforcement officials in Morgan County he voluntarily detailed his plans for the kidnap for ransom and the execution of it.
The court further finds that the defendant committed the offense charged for pecuniary gain. The wilful killing of the victim was committed by the defendant while he was engaged in kidnapping the victim for ransom. The offense was especially heinous, atrocious and cruel. The court further finds that the aggravating circumstances associated with the commission of this offense are sufficient to outweigh the mitigating fact the defendant has no sufficient history of prior criminal activity. The defendant's need for money for hospital and medical expenses for his wife is a need which is common in society; it was not sufficient to disable the defendant mentally or emotionally, and is not sufficient to reduce the punishment for the crime.
Therefore, the court finds that there is no legal basis for the court to change the punishment inflicted by the jury, and the punishment of death is hereby sustained.
 This the 15th day of September, 1977. (s)Newton B. Powell
CIRCUIT JUDGE